Filed 6/21/22 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MATTHEW C. CASEY et al., | D079221 |
| Plaintiffs and Appellants, | (Super. Ct. No. 37-2020-00046332-CU-EN-NC) |
| v. | |
| PATRICE HILL et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Respondents. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on May 23, 2022, be modified as follows:

1. On page 9, in the first sentence of the first paragraph, the phrase "(the Act)" is deleted.

2. On page 10, in the second sentence of the first full paragraph, the word "so-called" is deleted and the word "asserted" is inserted in its place.

3. On page 22, the second sentence of the second full paragraph beginning with "Applying those principals" is deleted and the following sentence is inserted in its place:

> We apply de novo review and determine the question of personal jurisdiction as a matter of law, based on the uncontradicted facts.

4.    On page 26, in the second sentence of the last paragraph beginning with "It reasoned" that carries over into page 27, the word "parties" is deleted and the word "parties' " is inserted in its place.

5.    On page 33, the third sentence of the last paragraph beginning "Section 11 of the agreement" is deleted and the following is inserted in its place:

> Section 11 of the agreement provides for arbitration in the County of Riverside, California, in accordance with California law.  "An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute."  (*Scherk v. Alberto-Culver Co.* (1974) 417 U.S. 506, 519.)

6.    On page 34, the last sentence of the first paragraph beginning "Even so construed" is deleted and the following is inserted in its place:

> Even so construed, the existence of a choice-of-law or choice-of-forum provision in the parties' contract is just a factor to be considered.  It does not determine whether personal jurisdiction can constitutionally be exercised in another forum.  (See *Burger King*, *supra*, 471 U.S. at p. 482; *Andra v. Left Gate Prop. Holding, Inc.* (Mo. 2015) 453 S.W.3d 216, 221, 231 (*Andra*) [holding out-of-state defendant had sufficient minimum contacts with Missouri to support the exercise of personal jurisdiction, notwithstanding forum selection clause providing for suit in Texas].)  The fact that the parties agreed to resolve their disputes in one state does not answer the question whether the defendant had sufficient minimum contacts with another state to make *that* state court's exercise of personal jurisdiction over the defendant constitutional.  Simply put, forum selection clauses do not " 'oust' a court of jurisdiction[.]"  (*The Bremen v. Zapata Off-Shore Co.* (1972) 407 U.S. 1, 12 (*Bremen*).)

7.    On page 34, the last sentence of the second paragraph beginning with "And as we later explain" is deleted and the following is inserted in its place:

> And as we later explain, Defendants fail to establish that they can assert their contractual rights to a choice of forum, or to arbitration, in this proceeding.

8.   On page 35, in line 4 of footnote 15, the phrase "through inaction" is to be inserted after the phrase "which is not subject to waiver" so that the sentence reads:

Defendants' argument conflates two concepts:  fundamental jurisdiction, which is not subject to waiver through inaction; and the contractual right to arbitrate, which is subject to waiver.

9.   On page 44, the fourth sentence of the last paragraph beginning with the phrase "Pursuant to our discussion above" is deleted and the following is inserted in its place:

As we have explained, the Missouri court's exercise of jurisdiction under its long-arm statute comported with the requirements of due process.  And "[a]s long as the sister state court had jurisdiction over the subject matter and the parties, a sister state judgment is entitled to full faith and credit 'even as to matters of law or fact erroneously decided.'"  (*Bank of America*, *supra*, 77 Cal.App.4th at p. 118.)

10.  On page 45, the first full paragraph beginning "Accordingly, Defendants are now precluded" and ending "(*Chicot*).)" is deleted.

11.  On page 45, in the first sentence of the second full paragraph, the word "so-called" is deleted and the word "asserted" is inserted in its place.

12.  On page 45, in footnote 18, the fourth sentence beginning "However, Defendants contend" is deleted, and the following is inserted in its place:

Where, as here, the contract contains a choice-of-law provision, Missouri courts have in some cases followed the selected state's law (see, e.g., *Raydiant Tech., LLC v. Fly-N-Hog Media Group, Inc.* (Mo.Ct.App. 2014) 439 S.W.3d 238, 240), and in other cases have followed Missouri law (see, e.g., *Reed v. Reilly Co., LLC* (Mo. 2017) 534 S.W.3d 809, 812 [applying Missouri law, without explanation]; *Thieret Family, LLC v. Delta Plains Services, LLC* (Mo.Ct.App. 2021) 637 S.W.3d 595, 605, fn. 6).

3

13.    On page 46, in the first full paragraph, the parenthetical citation beginning "(*Smith*, *supra*, 17 Cal.3d at p. 496 [California courts have discretion to decline to enforce choice of forum provisions]" is deleted and the following is inserted in its place:

(*Smith*, *supra*, 17 Cal.3d at p. 496 [California courts have discretion to decline to enforce choice of forum provisions]; *High Life Sales Co. v. Brown-Forman Corp.* (Mo. 1992) 823 S.W.2d 493, 497 & 496, fn. 2 (*High Life Sales*) [holding that choice of forum clauses are enforceable, but Missouri courts may decline enforcement if they conclude enforcement would be unfair or unreasonable]; see *Andra, supra*, 453 S.W.3d at p. 231 ["a forum selection clause does not automatically determine a court's personal jurisdiction over a defendant"].)

14.    The paragraph commencing at the bottom of page 46 with "Defendants fail to grapple with" and ending at the top of page 47 with "section 11 of the agreement" is deleted and the following paragraphs are inserted in its place:

Defendants fail to grapple with the unavoidable conclusion that they have waived any contractual rights to a choice of forum, or to arbitration, by waiting until this proceeding to assert them. (See *Menorah*, *supra*, 72 F.3d at p. 223 [defendant waived arbitration by allowing a default judgment to be entered and waiting until enforcement proceeding to seek arbitration].) They were properly served in the Missouri action and could have raised these issues in that proceeding. Instead, they chose not to appear, the Missouri court entered judgment, and that judgment is now final. However, Defendants contend they can invoke section 11 of the agreement in this proceeding. They argue that a forum selection clause that designates a state other than Missouri deprives a Missouri court of personal jurisdiction, and that a Missouri court, if presented with the parties' agreement to arbitrate their disputes in California, would invalidate the Missouri judgment for lack of personal jurisdiction.

In making this argument, Defendants miss a distinction. They rely on the rule that jurisdiction can be *obtained* by consent or waiver. (See, e.g., *Hope's Windows, Inc. v. McClain* (Mo.Ct.App. 2013) 394 S.W.3d 478, 483 (*Hope's Windows*).) But whether jurisdiction can be obtained by agreement is different from whether

4

jurisdiction can be *divested* by agreement. As we have explained, forum selection clauses do not " 'oust' a court of jurisdiction[.]" (*Bremen*, *supra*, 407 U.S. at p. 12; *High Life Sales*, *supra*, 823 S.W.2d at p. 496 [forum selection clause "does not deprive the non-designated state of jurisdiction except to the extent that in its discretion it determines that the enforcement of the clause is neither unfair nor unreasonable"].) In *Laser Vision Centers, Inc. v. Laser Vision Centers International* (Mo.Ct.App. 1996) 930 S.W.2d 29, 33, a Missouri appellate court disagreed with the proposition advanced by Defendants here and held that a Missouri default judgment was not void for lack of jurisdiction simply because the parties had agreed to resolve their disputes by arbitration in another forum.

Defendants, in arguing the opposite point, rely on a case in which a Missouri court rejected a challenge to the exercise of personal jurisdiction in a forum because the defendant had already consented to jurisdiction by signing an agreement that provided for suit *in that forum*. (See *Hope's Windows*, *supra*, 394 S.W.3d at pp. 483–484.) *Hope's Windows* is not this case. It involved a post-judgment challenge to the exercise of jurisdiction in the forum designated in the contract. Its holding is the logical result of the rule that when a party agrees to litigate in a particular forum, that party consents to personal jurisdiction in that forum. *Hope's Windows* did not involve the situation we have here—a post-judgment challenge to the exercise of personal jurisdiction in a non-designated forum. So it does not support the proposition Defendants advance here, namely that a Missouri court would invalidate the Missouri judgment for lack of personal jurisdiction based on section 11 of the agreement.

There is no change in judgment.

Respondents' petition for rehearing is denied.

HALLER, Acting P. J.

Copies to: All parties

5

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MATTHEW C. CASEY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> PATRICE HILL et al., <br><br> Defendants and Respondents. | D079221 <br><br><br> (Super. Ct. No. 37-2020-00046332-CU-EN-NC) |

APPEAL from an order of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Reversed and remanded with instructions.

Grant & Kessler, Melisa N. McKellar and Alexander Kessler for Plaintiffs and Appellants.

Law Offices of John M. Siciliano and John M. Siciliano for Defendants and Respondents.

INTRODUCTION

A husband and wife, both residents of Missouri, filed a lawsuit in Missouri state court against a California resident and California corporation for making deceptive and fraudulent representations to the couple in the course of providing them with adoption facilitation services.  Although the

California defendants were properly served with notice of the action, they did not respond, and a default judgment was entered.

The Missouri couple then applied in San Diego Superior Court for entry of judgment on the sister state judgment. In response, the California defendants, now also judgment debtors, moved to vacate entry of judgment. They asserted the Missouri court's exercise of personal jurisdiction over them violated their right to federal due process because they had insufficient minimum contacts with Missouri. The trial court agreed and granted the motion to vacate entry of the Missouri judgment.

We reverse. Although the California defendants disagreed that "any allegation of fraud committed upon a Missouri resident establishes Missouri jurisdiction," they did not challenge or refute the Caseys' claims that they directed communications claimed to be fraudulent and harmful *into* Missouri *at* Missouri citizens. Indeed, the trial court found the Caseys' suit "arose out of allegations that *defendants committed a 'tortious act' in Missouri* (i.e., fraud)." (Italics added.) On this record of undisputed facts, we review the trial court's order vacating the sister judgment de novo. Doing so, we conclude Missouri's exercise of personal jurisdiction over the California defendants in this case was constitutional. We further conclude the other defenses raised by the California defendants against recognition of the sister state judgment lack merit. Accordingly, we remand with instructions to the trial court to enter a new order denying the motion to vacate entry of the Missouri judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Missouri Action*

A.     *The Alleged Fraud*[1]

In 2015, Missouri residents Matthew Casey and his wife, Rebecca Casey,[2] were pursuing child adoption.  While exploring adoption opportunities, they were introduced to Patrice Hill, a resident of Murrieta, California and the sole owner of Unique Adoptions, Inc. (Unique), a California corporation operating out of Murrieta (together, Defendants).

Unique, which "holds itself out as a 'Nationwide Adoption Facilitator,' " provides services to couples seeking to adopt a child, including by helping them navigate the complexities of the adoption process.  An agent of Unique told the Caseys that Unique had a "wonderful, viable adoption opportunity" through an expectant mother named "Jessica," who lived in Weldon, California.  The agent said Jessica had been thoroughly vetted by Hill, and that Jessica wanted to put her baby up for adoption.

Unique's agent presented the Caseys with a written "Adoption Facilitation Agreement" (agreement).  (Capitalization omitted.)  The agreement stated that in exchange for a fee of $15,500, Unique would provide the following scope of services for the period of one year or until a successful adoption, whichever occurred first:  "[A]ct as Clients' advertising service by advertising Unique's services, gathering information from prospective

---

[1]     Our factual summary is derived from the declarations filed in support of, and in opposition to, the motion to vacate entry of the Missouri judgment.

[2]     To avoid confusion in subsequent references, we distinguish between the Caseys by referring to them using their first names.

birthmothers and passing [it] on to Clients, their attorneys and/or licensed agencies that Clients have chosen to represent their legal interests in the adoption process. As an adoption facilitator, Unique may advertise for the purpose of soliciting parties to an adoption or locating children for an adoption, and may act as an intermediary between parties to an adoption."

Unique's agent told the Caseys the agreement was non-negotiable and if they did not sign it, they would lose the adoption opportunity. On July 13, 2015, Matthew and Rebecca signed the agreement, in Missouri, and Hill signed on behalf of Unique. The Caseys paid the $15,500 fee by wire transfer from Missouri to Unique's California bank account. They also began paying a monthly $1,255 fee to Unique to cover Jessica's monthly expenses, which they were told was customary.

For the next 10 months or so, between July 2015 and May 2016, Unique communicated with the Caseys regarding its adoption facilitation services, in dozens of texts, emails, and phone calls. The Caseys were in Missouri when these communications took place. Unique's communications included discussions about payment instructions, Jessica's willingness to place her child for adoption, the requirement that the Caseys pay Jessica's monthly expenses before her third trimester, Jessica's health, promises to obtain Jessica's medical records, Jessica's birth plan, and that Unique was in contact with Jessica's adoption attorney.

From July until September 2015, the Caseys' communications with Unique went through its employees or agents other than Hill. Hill was in the hospital from July 3 to 12, 2015, and then was recovering from the medical condition for which she had been hospitalized. Pat Boucher, a Unique employee, was the Caseys' main point of contact during this period. Boucher and the other Unique employees who communicated with the Caseys "always

4

represented that Unique was [Hill's] company, that [Hill] was in charge, and that [Hill] was overseeing and directing" all of their work. Boucher told the Caseys that "everything related to the adoption goes through [Hill]." Boucher and the other employees, whom the Caseys communicated with during this initial period, served as "go-betweens" relaying information back and forth between the Caseys and Hill. Starting in September 2015, Matthew began communicating directly with Hill.

After months of believing they would be adopting a baby, the Caseys were devastated to learn "it was all a scam." Hill had never met with Jessica, "no proper screening ever took place," and Jessica would not be placing her child up for adoption. In fact, Jessica had never been a viable adoption opportunity, because she was married and under California's adoption laws she could not unilaterally place her child up for adoption. The Caseys also learned it was not, in fact, customary to pay a birthmother's monthly expenses prior to the third trimester.

Matthew confronted Hill about the "fraudulent adoption" by phone and email. Although Hill denied any wrongdoing and claimed Jessica had simply changed her mind about adoption, in a December 2015 email to Matthew, Hill offered to refund "$7500.00 of [their] 1 Year agreement." Matthew and Hill then had numerous communications to try and settle their dispute, all of which took place while Matthew was in Missouri.

Ultimately, Matthew agreed in a phone call with Hill that the Caseys would not pursue legal action and would consider the matter resolved, so long as Hill immediately refunded them the agreed-upon $7,500. Hill failed to provide the promised refund. On March 3, 2016, Matthew sent an email to Hill demanding payment. Hill responded that she would " 'send you what we can.' " Matthew told Hill that he and his wife would not accept payment in

5

installments. After a number of weeks, Unique sent the Caseys a check for $2,500. Matthew told Hill the check would be rejected unless she paid the agreed amount in full. Hill never made the additional payment.

B.    *The Caseys Sue Defendants in Missouri*

On October 7, 2016, the Caseys filed a lawsuit against Defendants (the Missouri action) in the Judicial Circuit Court of St. Louis County, Missouri (the Missouri court). In their operative pleading, they stated claims for violation of the Missouri Merchandising Practices Act (MMPA),[3] negligence, and breach of fiduciary duty.

In connection with their MMPA claim, the Caseys alleged Defendants had made deceptive, false, and misleading representations to them in the course of providing them with adoption facilitation services, including that Unique had met with Jessica and counseled her; had properly screened her; that Jessica presented a viable adoption opportunity; that Unique would provide copies of Jessica's medical records, including drug and alcohol screenings, on a regular basis; that Unique had an attorney who would

---

[3]    The fundamental purpose of the MMPA (Mo. Rev. Stat. § 407.010 et seq.) is to protect consumers, and "to promote that purpose, [it] prohibits false, fraudulent or deceptive merchandising practices." (*Huch v. Charter Communs., Inc.* (Mo. 2009) 290 S.W.3d 721, 723, 724.) To establish a violation of the MMPA, plaintiffs must prove they (1) purchased merchandise (which includes services) from the defendants (2) for personal, family or household purposes and (3) suffered an ascertainable loss of money or property (4) as a result of an act declared unlawful under the MMPA. (*Chochorowski v. Home Depot U.S.A., Inc.* (Mo.Ct.App. 2009) 295 S.W.3d 194, 198; *Edmonds v. Hough* (Mo.Ct.App. 2011) 344 S.W.3d 219, 223.) The fourth element is satisfied by evidence the defendants used or employed "deception, fraud, false pretense, false promise, misrepresentation, unfair practice, concealment, suppression, or omission" in connection with their services. (*Chochorowski*, at p. 198.)

6

perform the legal work necessary to finalize the adoption; and that it was "customary and appropriate" for the Caseys to pay Jessica's monthly expenses prior to the third trimester of pregnancy. They alleged Defendants committed these acts "willfully, intentionally, fraudulently, maliciously, and knowingly, and with the conscious disregard of [their] rights." They sought compensatory and punitive damages.

C.    *The Missouri Default Judgment*

The Caseys filed a motion for default judgment against Defendants in the Missouri court. On October 10, 2019, following an evidentiary hearing that included testimony from Matthew and Rebecca, the Missouri court found that Defendants had each been duly served with a proper summons and operative pleading by a registered process server on April 8 and September 1, 2018, respectively, and that they were each in default because they had failed to file an answer within the prescribed time period.[4] Accordingly, the Missouri court issued a judgment and order granting the Caseys' motion for default judgment against Defendants (the Missouri judgment).

The Missouri court found Defendants "were in the business of providing adoption services to couples seeking to adopt a child for a fee" and "sold their services and held themselves out for hire to the citizens and residents of Missouri, including [the Caseys]." For a fee paid, Defendants "sold [the Caseys] 1) the opportunity to be matched with 'Jessica', an expectant mother wishing to put her child for adoption, and 2) all the concomitant services and steps necessary to consummate the adoption of Jessica's unborn child." The court found the Caseys "learned late in the process of the adoption that

---

[4]    Defendants have not, either in the course of their efforts to vacate entry of the Missouri judgment nor in this appeal, disputed that they were properly served with process in the Missouri action.

7

Jessica had no true intention to put her child up for adoption. Rather, Jessica was perpetrating a scam in order to receive the financial benefits paid to adoptive mothers prior to the birth of their child."

The Missouri court further found Defendants made "deceptive, false, and misleading representations to [the Caseys] through words and actions." The specific false statements included: "Unique had met with Jessica, and counseled her concerning the adoption process; . . . Unique had properly screened Jessica; that Jessica presented a viable adoption opportunity; that . . . Unique would provide [the Caseys] with copies of Jessica's medical records, including drug and alcohol screenings, on a regular basis; that . . . Unique had an attorney . . . who would perform the legal work necessary to finalize the adoption; that it was customary and appropriate for [the Caseys] to pay Jessica's monthly expenses prior to her third trimester of pregnancy." The court found the representations made by Hill and Boucher were within the course and scope of their employment, and that Unique was vicariously liable for their misconduct. "[A]s a direct result of the deceptive, false, and misleading representations, [the Caseys] were induced to and did in fact purchase . . . services from the Defendants, in reliance upon Defendants' representations."

The Missouri court found the Caseys had been damaged, and that Defendants' conduct "was outrageous because of reckless indifference to the rights of others." It entered judgment against Defendants, and awarded the Caseys $31,175.00 in compensatory damages, $15,375.00 in attorney fees as the prevailing party under the MMPA, $1,410.00 in costs, and $500,000 in punitive damages, for a total judgment of $547,960.00. Having found Defendants liable for violation of the MMPA, the court dismissed the remaining counts for negligence and breach of fiduciary duty.

8

## II.

### *The California Proceedings*

A.   *The Caseys' Application to Enter Judgment on the Missouri Judgment*

On December 17, 2020, the Caseys applied in San Diego Superior Court for entry of judgment on the Missouri judgment in the amount of $592,171.75 (representing the original Missouri judgment amount of $547,960.00 plus accrued post-judgment interest at the Missouri statutory rate), pursuant to California's Sister State Money Judgments Act (the Act).  (Code Civ. Proc.,[5] § 1710.10 et seq.)  The same day, the clerk of the superior court granted the application and entered a judgment against Defendants in the amount of $592,171.75.

B.   *Defendants' Motion to Vacate Entry of the Missouri Judgment*

On January 20, 2021, Defendants moved to vacate entry of the Missouri judgment pursuant to section 1710.40.  Section 1710.40 provides that "[a] judgment entered pursuant to this chapter may be vacated on any ground which would be a defense to an action in this state on the sister state judgment, including the ground that the amount of interest accrued on the sister state judgment and included in the judgment entered pursuant to this chapter is incorrect."  (§ 1710.40, subd. (a)).  They asserted several defenses to California's recognition or enforcement of the Missouri judgment.

First, Defendants claimed the Missouri court had violated their right to federal due process by exercising personal jurisdiction over them.  They argued they had less than the minimum contacts required to support the constitutional exercise of personal jurisdiction.  They asserted the Caseys were the first to reach out to them, that they did not advertise in Missouri

---

[5]   Unspecified statutory references are to the Code of Civil Procedure.

and had no other business dealings or contacts with Missouri, and that in connection with the services they provided to the Caseys, they had "exclusively performed their services within California by finding a birthmother located in Weldon, California." They argued it was unfair and inconvenient to require them to defend themselves in a suit filed in Missouri, because they were not licensed to provide adoption facilitation services there and could not reasonably be expected to understand and comply with that state's adoption laws.

Second, they claimed they had a defense to recognition of the Missouri judgment based on section 11 of the agreement, which they described as "a binding arbitration clause." (Boldface omitted.) The so-called "binding arbitration clause" in section 11 provided:

> "ARBITRATION. Any controversy, claim or dispute arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in the County of Riverside, State of California, before a sole arbitrator in accordance with the laws of the State of California for agreements made and to be performed in the State of California. [¶] The arbitration shall be administered by JAMS pursuant to its streamlined Arbitration Rules. The arbitration shall be conducted in the County of Riverside, State of California. Judgment on the award may be entered in any court having jurisdiction." (Boldface omitted.)

Defendants asserted that an agreement to binding arbitration "constitutes a valid defense to an action in this state because the arbitration agreement can and should be pleaded as an affirmative defense."

Defendants' third defense also relied on section 11 of the agreement, and more specifically on the language stating that disputes arising out of or relating to the agreement would be determined " 'by arbitration in the County of Riverside, State of California, before a sole arbitrator in accordance

10

with the laws of the State of California for agreements made and to be performed in the State of California.'" (Underscore omitted.) Claiming the quoted language constituted valid "choice of forum and choice of law provisions," they argued the Missouri court was "foreclosed from infringing upon this valid contract term," and as a result, the Missouri judgment was invalid.

As their fourth ground for vacating entry of the judgment, Defendants asserted what they called a parol evidence defense. They argued they "did not and simply could not commit the purported fraud alleged by [the Caseys in the Missouri action] because the alleged fraud was not even within the scope of [D]efendants' services[.]" Pointing to a provision in the agreement stating that Unique made no promises or guarantees about the outcome of any attempted adoption, they argued that all of their assertedly fraudulent representations involved such false guarantees. And since the agreement stated they made no such guarantee, they argued, they "committed no fraud and have a valid defense based upon the parole [sic] evidence rule."

In a supporting declaration, Hill acknowledged she had signed the agreement on behalf of Unique, and that Unique's scope of services under the agreement included "'gathering information from prospective birthmothers and passing [it] on to Clients.'" She averred that as part of these agreed upon services, she or Unique obtained background information from Jessica, and provided that information to the Caseys. She acknowledged the Caseys were told "it was customary and appropriate for potential adoptive parents to pay the birthmother's monthly living expenses prior to her third trimester of pregnancy." She stated, however, that all services provided to the Caseys "were performed exclusively in California" and she "did not set foot in Missouri."

11

The Caseys filed an opposition brief, supported by a declaration from Matthew, who attested to the false representations that Defendants made to him and his wife that formed the basis of the claims in the Missouri action. The Caseys argued Defendants had sufficient contacts with Missouri to make the Missouri court's exercise of personal jurisdiction constitutional, including because Defendants sent their fraudulent communications into Missouri, purposefully did business with the Caseys knowing they resided in Missouri, entered into an agreement to perform services for the Caseys "which would culminate in the adoption of a child who would ultimately reside in Missouri," and "took money from Missouri citizens." Based on this tortious conduct directed at Missouri, they argued, Defendants could "hardly . . . be surprised" to be haled into court in Missouri.

In response to Defendants' contention that the assertion of jurisdiction in Missouri was unfair due to their lack of familiarity with Missouri adoption facilitation law, the Caseys argued that not knowing the law of a state is not a defense to jurisdiction. They also argued Defendants' ignorance of Missouri adoption facilitation law had nothing to do with the fairness of exercising jurisdiction over them in the Missouri action, since the Missouri action did not involve an alleged violation of, nor an award of damages under, any such law. As for Defendants' other defenses, the Caseys argued they were not recognized defenses to recognition or enforcement of a sister state judgment. To the extent the defenses relied on section 11 of the agreement, they argued that any defenses based on arbitration or venue provisions had to be timely asserted or they were waived.

In reply, Defendants disagreed that "<u>any</u> allegation of fraud committed upon a Missouri resident establishes Missouri jurisdiction."[6]  They argued their own California contacts and activities prevailed and compelled the conclusion that they did not have the required minimum contacts with Missouri.  In a supplemental brief, Defendants asserted Unique "did not perform any services in Missouri," and that the agreement's "forum selection clause" was "prima facie valid" and "acts as a complete waiver of Missouri jurisdiction."  They further asserted that the Caseys had "evidently perpetrated a fraud on the Missouri court by concealing both the written contract and the forum selection clause from the Missouri court while claiming Missouri had jurisdiction and was the appropriate venue."

C.    *The Trial Court's Ruling Vacating Entry of the Missouri Judgment*

After hearing arguments, the trial court ruled the Missouri court's exercise of personal jurisdiction over Defendants under Missouri's long arm statute violated federal due process and granted the motion to vacate entry of the sister state judgment in California.

As noted by the trial court, Missouri's long arm statute provides, in relevant part:

> "Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:
>
> (1)    The transaction of any business within this state;

---

6    Notably, and relevant to the standard of review, Defendants did not submit any evidence or declarations challenging or refuting the Caseys' claims that Defendants made the assertedly fraudulent representations, and did so by communications directed *into* Missouri at Missouri citizens.

13

(2)     The making of any contract within this state;

(3)     The commission of a tortious act within this state;

(4)     The ownership, use, or possession of any real estate situated in this state;

(5)     The contracting to insure any person, property or risk located within this state at the time of contracting[.]"  (Mo. Rev. Stat. § 506.500 (Supp. 1986).)

The trial court also observed that Missouri's long arm statute "is construed 'to extend the jurisdiction of the courts of [Missouri] over nonresident defendants to that extent permissible under the Due Process clause.'  [(*State ex rel. Deere & Co. v. Pinnell* (Mo. 1970) 454 S.W.2d 889, 892 (*Pinnell*).)]"  Thus, "[i]n order to subject [D]efendants to the jurisdiction of the Missouri courts under Missouri's long arm statute, [the Caseys] must meet two requirements:  (1) the suit must arise out of the activities enumerated in the statute; and (2) the defendants must have contacts with Missouri sufficient to satisfy due process requirements."

The trial court found the first requirement satisfied:  "[T]he suit arose out of allegations that *[D]efendants committed a 'tortious act' in Missouri* (i.e., fraud)."  (Italics added.)  But as to the second requirement, the court concluded Defendants had established that their contacts with Missouri were "insufficient to satisfy due process requirements . . . [under] controlling United States Supreme Court precedent."

Specifically, as to the second requirement, the trial court found Defendants "did not purposefully avail themselves of Missouri benefits" such that the Missouri court lacked specific jurisdiction over the nonresident Defendants.[7]  In so ruling, the court found Defendants "did not advertise in

_____

7     The Caseys did not contend Missouri had general jurisdiction over Defendants.  Accepting their concession, the trial court found Missouri lacked

14

Missouri, and had no other business dealings or contacts with Missouri";
"[t]he relationship between these parties commenced when [the Caseys]
contacted [Unique] in California"; and the parties then entered into "a
written agreement indicating that Unique . . . would render services in
California." The court also found "[t]he agreement contains choice-of-law and
choice-of-forum provisions, indicating that [D]efendants contemplated
rendering their services in California, subject to California law, with any
disputes to be adjudicated in California."[8]

general jurisdiction over Defendants because there was no evidence that they
were "so 'heavily engaged in activity in [the state] as to render it essentially
at home.' " There also is no contention in this appeal that Missouri had
general jurisdiction over the Defendants.

[8]      The trial court also made certain findings that contradicted findings
made by the Missouri court in its judgment. Specifically, the trial court
found: "Hill has no relationship with Missouri and did not provide any
services in Missouri"; "Unique . . . has no relationship with Missouri and did
not provide services in Missouri"; and "[D]efendants did not advertise in
Missouri or purposefully direct services to Missouri residents." By contrast,
the Missouri court found: "Defendants sold their services and held
themselves out for hire to the citizens and residents of Missouri, including
[the Caseys]"; and "[s]pecifically, Defendants sold [the Caseys] 1) the
opportunity to be matched with 'Jessica', an expectant mother wishing to put
her child for adoption, and 2) all the concomitant services and steps necessary
to consummate the adoption of Jessica's unborn child." The trial court, in
concluding Defendants "did not provide any services *in* Missouri" (italics
added), ignored that, as the Missouri court found, the services were provided
*to* Missouri citizens while *in* Missouri. As we will discuss, the trial court also
ignored the uncontradicted evidence, including Hill's own admissions,
establishing that Unique's services—as laid out in the agreement drafted by
Unique, and as actually performed by Unique—included " 'gathering
information from prospective birthmothers and passing [it] on to Clients,' "
who in this case were *in* Missouri. These were, of course, the very
communications that formed the basis of Defendants' liability for fraudulent
services under the MMPA. Although Hill simultaneously averred that she

15

Next, the trial court determined the assertion of personal jurisdiction over Defendants in Missouri did not comport with fair play and substantial justice. It ruled: "It is fundamentally unfair that an individual and her small business, operating in one state, can enter into a written agreement to perform $15,500 worth of adoption-related services in that state, with a forum-selection clause saying any dispute will be brought in that state, and then be sued in another state half-way across the country and become subject to a $500,000 default judgment in the other state without ever providing any services in that other state and without having any other contacts with the other state."

The trial court did not address Defendants' other defenses to recognition or enforcement of the Missouri judgment. On March 23, 2021, Defendants filed and served a notice of entry of the trial court's minute order granting their motion. The Caseys timely appealed.[9]

DISCUSSION

The Caseys contend the trial court erred when it ruled the Missouri court's exercise of personal jurisdiction over Defendants under Missouri's long arm statute violated the federal Constitution. Defendants disagree with this contention, but in the event we conclude the trial court erred, they ask us to affirm the court's order granting their motion to vacate entry of the Missouri judgment on the basis of the other defenses raised in their motion.

performed her services "exclusively in California," such a conclusory assertion does not create an issue of fact. (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 525 [" 'an issue of fact is not raised by "cryptic, broadly phrased, and conclusory assertions" ' "].)

9　A trial court's order vacating entry of a sister state judgment under section 1710.40 is an appealable order. (*Liebow v. Superior Court* (1981) 120 Cal.App.3d 573, 576; *Fishman v. Fishman* (1981) 117 Cal.App.3d 815, 819.)

16

We agree with the Caseys that the trial court erred in its order vacating entry of the Missouri judgment, and further conclude that Defendants' other defenses to recognition of the Missouri judgment lack merit.

I.

*Principles Governing Recognition of a Sister State Judgment*

A.    *Full Faith and Credit Clause*

Article IV, section 1 of the United States Constitution states that "[f]ull Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."  For judgments, "the full faith and credit obligation is exacting."  (*Baker v. GMC* (1998) 522 U.S. 222, 233.) Pursuant to this constitutional mandate, "[a] final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land.  For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force." (*Baker v. GMC*, at p. 233.)  Thus, " '[i]t has long been the law that "the judgment of a state court should have the same credit, validity, and effect in every other court in the United States, which it had in the state where it was pronounced." ' " (*Liquidator of Integrity Ins. Co. v. Hendrix* (1997) 54 Cal.App.4th 971, 975 (*Liquidator*), quoting *Thomas v. Washington Gas Light Co.* (1980) 448 U.S. 261, 270.)

"Moreover, ' "[while] it is established that a court in one State, when asked to give effect to the judgment of a court in another State, may constitutionally inquire into the foreign court's jurisdiction to render that judgment, the modern decisions of [the Supreme] Court have carefully delineated the permissible scope of such an inquiry.  From these decisions there emerges the general rule that a judgment is entitled to full faith and

17

credit--even as to questions of jurisdiction--when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." ' " (*Bank of America v. Jennett* (1999) 77 Cal.App.4th 104, 113 (*Bank of America*).)

Accordingly, "[u]pon a claim that a foreign judgment is not entitled to full faith and credit, inquiry into the legality of proceedings in a court of a sister state is narrowly circumscribed by case law. The permissible scope of inquiry upon such a party is limited to whether the court of rendition has 'fundamental' jurisdiction [citation]. In other words, a judgment entered by one state must be recognized by another state if the state of rendition had jurisdiction over the parties and the subject matter and all interested parties were given reasonable notice and an opportunity to be heard." (*Thorley v. Superior Court* (1978) 78 Cal.App.3d 900, 907; accord *Bank of America*, *supra*, 77 Cal.App.4th at p. 114; *Washoe Dev. Co. v. Irving Sav. Ass'n* (1996) 47 Cal.App.4th 1518, 1522–524 (*Washoe*).)

B.  *California's Sister State Money Judgments Act*

In 1974, "[p]artially in response to the constitutional mandate of full faith and credit, the California Legislature enacted the Sister State Money Judgments Act (the Act)." (*Bank of America*, *supra*, 77 Cal.App.4th at p. 114; *Washoe*, *supra*, 47 Cal.App.4th at pp. 1521–1522.) The Act "provide[s] economical and expeditious registration procedures for enforcing sister state money judgments in California." (*Bank of America*, at p. 114.)

Prior to the Act, the creditor of a money judgment issued by the court of another state who wanted to pursue recognition and enforcement in California was required to file an original action for registration of the sister state judgment. (See *Aspen Internat. Capital Corp. v. Marsch* (1991) 235 Cal.App.3d 1199, 1203; *Tom Thumb Glove Co. v. Han* (1978) 78 Cal.App.3d 1,

18

7.) The Act created " '[a] simpler and more efficient method of enforcing [sister state] judgments than the traditional action on the judgment. The registration procedure established by the [Act] is designed to allow parties to avoid the normal trappings of an original action, e.g., the necessity for pleadings. The optional procedure was intended to offer savings in time and money to both courts and judgment creditors, yet, at the same time, remain fair to the judgment debtor by affording him the opportunity to assert any defense that he could assert under the traditional procedure.' " (*Aspen*, at p. 1203.) "Upon simple application in conformance with the Act (§§ 1710.15, 1710.20), entry by the clerk of a judgment based upon the application is mandatory (§ 1710.25), constituting a ministerial act of the clerk and not a judicial act of the court[.]" (*Ibid.*) Under the Act, entry of judgment on the sister state judgment " 'is ministerial only, that is, an activity by the clerk of [the] court.' " (*Ibid.*) The newly entered judgment has the same force and effect as a judgment originally issued by a California court "and may be enforced or satisfied in like manner." (§ 1710.35.)

The judgment debtor then has 30 days to challenge entry of the sister state judgment by filing a motion to vacate entry of judgment based on "any ground which would be a defense to an action in this state on the sister state judgment[.]"[10] (§ 1710.40, subds. (a), (b).) Relevant here, Defendants asserted the Missouri judgment was invalid on the ground that the Missouri court's exercise of personal jurisdiction violated due process. This was an available defense to recognition of the Missouri judgment. (See, e.g., *State of*

---

[10] We note the defenses that may be asserted in a motion to vacate under section 1710.40 are not well defined. The Act itself does not specify the available defenses. We later discuss the scope of defenses under section 1710.40. (See Discussion, section III., *post*.)

*Arizona ex rel. Arizona Dept. of Revenue v. Yuen* (2009) 179 Cal.App.4th 169, 179, 180 [affirming trial court order vacating entry of judgment on an Arizona judgment on due process grounds based on the determination the judgment debtor did not have notice of the proceedings]; *Bank of America, supra*, 77 Cal.App.4th at p. 115, fn. 8 [noting that "several California courts that have examined whether a sister state court lacked jurisdiction over the parties or over the subject matter have characterized the issue as an inquiry into whether the judgment was entered in 'excess of jurisdiction' "]; cf. *Conseco Marketing, LLC v. IFA & Ins. Services, Inc.* (2013) 221 Cal.App.4th 831, 839 (*Conseco*) [holding that although the defendant's challenge to the foreign court's exercise of personal jurisdiction was an *unlisted* defense, it could nevertheless be asserted under section 1710.40].)

C.     *Standard of Review*

The party moving to vacate entry of judgment has the burden to show by a preponderance of the evidence that she is entitled to relief.  (*Tsakos Shipping & Trading, S.A. v. Juniper Garden Town Homes, Ltd.* (1993) 12 Cal.App.4th 74, 88 (*Tsakos*).)  "On appeal of the court's ruling [vacating entry of a sister state judgment], we apply settled principles of appellate review. [Citations.]  As this matter involves a review of the trial court's determination of in personam jurisdiction, 'we will not disturb the court's factual determinations "if supported by substantial evidence."  [Citation.] "When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record." ' " (*Wells Fargo Bank, NA v. Baker* (2012) 204 Cal.App.4th 1063, 1068 (*Wells Fargo*), quoting *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 273 (*Pavlovich*); see *Pavlovich*, at p. 273, quoting *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 (*Vons*).)

20

The parties suggest that we apply a different standard of review. Both sides cite *Conseco, supra,* 221 Cal.App.4th at page 841, for the proposition that a trial court order granting or denying a motion to vacate pursuant to section 1710.40 is reviewed for an abuse of discretion. The parties are correct that *Conseco* states " '[t]he ruling on a motion to set aside a judgment rests in the sound discretion of the trial court and will not be set aside on appeal unless a clear abuse of discretion appears.' " (*Conseco,* at p. 841.) However, we disagree that the standard of review adopted by the *Conseco* court is the one that applies here.

For one thing, the standard of review used by the *Conseco* court originated in a materially different procedural context. *Conseco* relied on *Tsakos, supra,* 12 Cal.App.4th at pages 88 to 89, which in turn relied on *Zirbes v. Stratton* (1986) 187 Cal.App.3d 1407, 1411. But *Zirbes* involved a trial court order vacating a judgment under section 473, not section 1710.40. (*Zirbes,* at p. 1411.) Section 473 is quite different from section 1710.40. It "allows a court to relieve a party from a judgment taken against him or her because of mistake, inadvertence, surprise or excusable neglect. It is settled '[the] granting or denial of a motion to set aside an order or judgment under section 473 rests largely in the discretion of the trial court, and its decision will not be disturbed on appeal unless there has been a clear abuse of discretion.' " (*Zirbes,* at p. 1411.) Section 1710.40, by contrast, is part of a procedural enactment that implements the Full Faith and Credit Clause (*Bank of America, supra,* 77 Cal.App.4th at p. 114; *Washoe, supra,* 47 Cal.App.4th at p. 1521), which is an "exacting" constitutional mandate (*Baker v. GMC, supra,* 522 U.S. at p. 233). Given the strictness of the underlying mandate, we perceive no room for discretion in determining whether a sister state judgment merits recognition in this state.

21

For another, *Conseco* did not involve appellate review of a challenge to the sister state court's exercise of personal jurisdiction. However, *Wells Fargo* did involve such a challenge. Further, *Wells Fargo* relied on *Vons* and *Pavlovich*, both of which are California Supreme Court decisions addressing the permissible scope of a court's exercise of personal jurisdiction under the Fourteenth Amendment of the United States Constitution. We are required to follow *Vons* and *Pavlovich*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Accordingly, we apply the principles of review articulated in *Wells Fargo*. Applying those principles to this case, we apply de novo review and determine the question of personal jurisdiction as a matter of law, based on the uncontradicted facts. (See *Wells Fargo*, *supra*, 204 Cal.App.4th at p. 1068.)[11]

## II.

*The Trial Court Erred in Ruling That the Missouri Court's Exercise of Personal Jurisdiction Violated Due Process*

On our independent review of the record and the trial court's ruling, we conclude the court erred in finding the Missouri court's exercise of personal jurisdiction over Defendants was unconstitutional. As the Caseys rightly contend, it was undisputed that Defendants' communications with the Caseys

---

[11]  Because we conclude the trial court's ruling resulted from errors of law, and of application of law to uncontradicted facts, we would find reversible error even under an abuse of discretion standard. (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 540 [" ' "Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." ' "]; *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 712, fn. 4 [" 'The trial court does not have discretion to depart from legal standards.' "], parenthetically quoting *People v. Neely* (1999) 70 Cal.App.4th 767, 775–776.)

22

were sent into Missouri and caused harm in Missouri, and that these were the same communications that contained the alleged fraudulent misrepresentations at issue in the Missouri action.  The trial court erred by failing to consider these relevant, undisputed jurisdictional facts, which were dispositive of the minimum contacts issue.  The court also erred in determining the exercise of personal jurisdiction was unfair, because Defendants failed to meet their burden of presenting a compelling case of unfairness.

A.     *Specific Jurisdiction*

Missouri's long-arm statute permits courts in Missouri to exercise jurisdiction over nonresident defendants "to that extent permissible under the Due Process clause."  (*Pinnell, supra,* 454 S.W.2d at p. 892.)  The exercise of personal jurisdiction by courts in Missouri is thus limited primarily by the Due Process Clause of the United States Constitution.  (See *Ford Motor Co. v. Montana Eighth Judicial Dist. Court* (2021) 141 S.Ct. 1017, 1024 (*Ford Motor*) ["The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant."]; *Bristol-Myers Squibb Co. v. Superior Court* (2017) 137 S.Ct. 1773, 1779 (*Bristol-Myers*) ["It has long been established that the Fourteenth Amendment limits the personal jurisdiction of state courts."].)

"The Due Process Clause [of the United States Constitution] protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.' [Citation.]  By requiring that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign,' [citation], the Due Process Clause 'gives a degree of predictability to the legal system that allows potential defendants to structure their

23

primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.' " (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 471–472 (*Burger King*).) "Although a nonresident's physical presence within the territorial jurisdiction of the court is not required, the nonresident generally must have 'certain minimum contacts . . . such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " (*Walden v. Fiore* (2014) 571 U.S. 277, 283 (*Walden*).)

There are "two kinds of personal jurisdiction:  general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." (*Ford Motor, supra,* 141 S.Ct. at p. 1024.)  The issue in this case relates to specific jurisdiction, which is personal jurisdiction that exists only for a particular case.  (*Walden, supra,* 571 U.S. at pp. 283–284.)

Specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims.  The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.'  [Citation.] The defendant, . . . must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'  [Citation.] The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'  [Citation.]  They must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there.  [Citation.] Yet even then—because the Defendant is not 'at home'—the forum State may exercise jurisdiction in only certain cases.  The plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum.  [Citations.] Or put just a bit differently, 'there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence

24

that takes place in the forum State and is therefore subject to the State's regulation." ' " (*Ford Motor*, *supra*, 141 S.Ct. at pp. 1024–1025.)

Moreover, "in analyzing the exercise of specific jurisdiction, '[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, [those] contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." ' [Citations.] Courts may evaluate the burden on the defendant of appearing in the forum, the forum state's interest in adjudicating the claim, the plaintiff's interest in convenient and effective relief within the forum, judicial economy, and 'the "shared interest of the several States in furthering fundamental substantive social policies." ' " (*Vons*, *supra*, 14 Cal.4th at pp. 447–448, citing *Burger King*, *supra*, 471 U.S. at pp. 476–477.) Thus, "even if the defendant has purposefully engaged in forum activities," the "minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction." (*Burger King*, at pp. 477–478; *Pavlovich, supra,* 29 Cal.4th at p. 269.)

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on "the relationship among the defendant, the forum, and the litigation." ' " (*Walden*, *supra,* 571 U.S. at pp. 283–284; accord *Bristol-Myers, supra,* 137 S.Ct. at p. 1782.) Courts employ a three-part test to determine whether a defendant has had sufficient minimum contacts with the forum state to be subject to specific jurisdiction. A court may exercise specific jurisdiction over a nonresident defendant *only if*: (1) the defendant has purposefully availed himself of forum benefits or purposefully directed his activities at the forum state; (2) the controversy is related to or arises out of the defendant's contacts with the forum; and (3) the

25

assertion of personal jurisdiction would comport with the principles of fair play and substantial justice. (*Pavlovich, supra,* 29 Cal.4th at p. 269; *Vons, supra,* 14 Cal.4th at pp. 446–447; *Picot v. Weston* (9th Cir. 2015) 780 F.3d 1206, 1211 (*Picot*) [applying California law to determine whether California could exercise specific jurisdiction over a nonresident defendant].)

As to the first prong, "[t]he exact form of our jurisdictional inquiry depends on the nature of the claim at issue." (*Picot, supra*, 780 F.3d at p. 1212.) For claims sounding in contract, courts generally apply a " 'purposeful availment' " analysis, where the focus is on the " 'defendant's intentionality.' " (*Pavlovich, supra*, 29 Cal.4th at p. 269; *Picot*, at p. 1212.) " 'This [inquiry] is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on' his contacts with the forum." (*Pavlovich*, at p. 269.) For claims sounding in tort, courts generally apply a " 'purposeful direction' test and look to evidence that the defendant has directed his actions at the forum state, even if those actions took place elsewhere." (*Picot*, at p. 1212; accord *Pavlovich*, at p. 270.) This test, also known as the "*Calder* effects test" derived from *Calder v. Jones* (1984) 465 U.S. 783 (*Calder*), "requires intentional conduct *expressly aimed at or targeting* the forum state in addition to the defendant's knowledge that his intentional conduct would cause harm in the forum." (*Pavlovich*, at p. 271.)

B. *Analysis*

1. *Purposeful Direction*

Despite finding the Missouri action "arose out of allegations that [Defendants] committed a 'tortious act' in Missouri (i.e., fraud)," the trial court found the evidence of purposeful availment lacking. It reasoned that

26

Defendants did not advertise in Missouri, had no business dealings or contacts in Missouri other than their dealings with the Caseys, and, based on purported choice-of-law and choice-of-forum provisions in the parties agreement, Defendants contemplated "rendering their services in California, subject to California law, with any disputes to be adjudicated in California."

This analysis was erroneous. The trial court ignored the material jurisdictional facts, which were undisputed: Defendants sent communications into Missouri that contained allegedly fraudulent misrepresentations and caused injury in Missouri, and which were the basis of the claims asserted against Defendants in the Missouri action. Under settled principles, these facts were sufficient to satisfy the first prong of the specific jurisdiction inquiry.

Under *Calder*, a defendant whose "intentional, and allegedly tortious" actions were purposefully directed at the forum is subject to the personal jurisdiction of its courts. (*Calder*, *supra*, 465 U.S. at pp. 789–790.) In *Calder*, a California actress sued a Florida journalist and editor for libel based on an article in the National Enquirer. (*Id.* at pp. 784–786.) The high court held the Florida residents could be sued in California despite insubstantial contacts with California, because they had "expressly aimed" their tortious conduct at California and the "brunt of the harm" was suffered there. (*Id.* at p. 789.) "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." (*Id.* at p. 790.)

Applying these principles, numerous courts have found the purposeful direction requirement met where the nonresident defendant purposefully sent tortious communications into a forum and thereby injured its residents. (*Yue v. Yang* (2021) 62 Cal.App.5th 539, 547–548 [purposeful availment

27

requirement met where nonresident defendant allegedly defamed and threatened the plaintiff, a California resident, in direct correspondence with the plaintiff in California and in website posts that "were directed to, and received by, a California audience" and were intended to cause harm in California]; *Moncrief v. Clark* (2015) 238 Cal.App.4th 1000, 1006–1007 (*Moncrief*); [Arizona attorney misrepresented client's ownership of equipment that was the subject of a single sales transaction in interstate communications with California attorney, thereby purposefully availing himself of California benefits]; *West Corp. v. Superior Court* (2004) 116 Cal.App.4th 1167, 1174–1176 (*West Corp.*) [out-of-state telemarketers who used allegedly unlawful techniques in phone call with California resident purposefully availed themselves of the privilege of conducting activities in California]; *Neal v. Janssen* (6th Cir. 2001) 270 F.3d 328, 332–333 [purposeful availment established based on nonresident's misrepresentations in interstate communications with forum resident, where "[t]he alleged misrepresentations are the elements of the cause of action itself"]; see *Bryant v. Smith Interior Design Group, Inc.* (Mo. 2010) 310 S.W.3d 227, 234 (*Bryant*) [stating that "[n]umerous cases . . . have held that the sending of fraudulent documents into a state constitutes a purposeful availment of the privilege of conducting activities within the forum state and provides the minimum contacts necessary to support personal jurisdiction in that state when the claim arises out of those contacts"]; *Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.* (9th Cir. 2018) 905 F.3d 597, 603 [stating the first two prongs of specific jurisdiction test are met where "a non-Californian defendant [makes an] allegedly fraudulent demand for payment . . . to a California entity"].)

*Moncrief* is illustrative.  In *Moncrief*, the parties were an Arizona attorney, a California attorney, and their respective law firms.  (*Moncrief*,

*supra*, 238 Cal.App.4th at p. 1003.)  Moncrief, the California attorney, had been hired to perform due diligence in connection with his California client's purchase of farm equipment from an Arizona company.  (*Ibid.*)  While in California, he called Clark, the Arizona attorney representing the seller, to discuss the ownership status of the equipment.  (*Id.* at pp. 1003–1004.)  In a phone conversation and subsequent email, Clark represented that his client was the sole owner of the equipment.  (*Id.* at p. 1004.)  When it was later discovered this was not true, the California client sued Moncrief in a California state court for legal malpractice, and Moncrief cross-complained against Clark for equitable indemnity, negligence, intentional and negligent misrepresentation, and concealment.  (*Ibid.*)  The court granted Clark's motion to quash, concluding there was no purposeful availment because Clark did not initiate contact with Moncrief, did not target Moncrief " 'or California,' " and there had been only " 'a random attenuated and insufficient contact to establish specific jurisdiction.' "  (*Ibid.*)

The Court of Appeal reversed, finding the requirements of due process were met and that the interactions between the parties did, in fact, demonstrate purposeful availment.  (*Moncrief*, *supra*, 238 Cal.App.4th at pp. 1006–1007.)  The court found Clark purposefully availed himself of the benefits of California "when he communicated via telephone and e-mail with Moncrief" for "the specific purpose of inducing the completion of the equipment sale."  (*Id.* at p. 1006.)  Although the communications involved only a single transaction, "Clark targeted Moncrief with the specific purpose of inducing Moncrief's client to finalize the purchase[.]"  (*Id.* at p. 1007.)  Clark's communications were thus "purposely and voluntarily directed toward California ' "so that he should expect, by virtue of the benefit he

29

receive[d], to be subject to the [California] court's jurisdiction based on" his contacts with the forum.' " (*Ibid.*)

The same analysis, applied here, compels the same conclusion: the first prong of the specific jurisdiction test was satisfied. The Caseys' evidence established that Defendants presented them with a proposed agreement to provide adoption facilitation services in exchange for a $15,500 fee, and that the Caseys then entered into the agreement from Missouri and paid the required fee with Missouri funds. This evidence was undisputed. The agreement, by its own terms, called for Unique to communicate with its Missouri clients, the Caseys, about the proposed birthmother. Defendants did not dispute this point. To the contrary, Hill herself averred that "I signed [the agreement] on behalf of Unique, by which [the Caseys] retained defendant, Unique's, adoption facilitation services in California, which included 'gathering information from prospective birthmothers and passing [it] on to Clients[.]"

It was also undisputed that in performing the agreement, Defendants sent dozens of emails and text messages to the Caseys, and had numerous phone calls with the Caseys, while the Caseys were in Missouri, and that the subject of these communications included "payment instructions, representations concerning Jessica's health, that Unique was in contact with Jessica's adoption attorney, Jessica's birth plan, that Jessica was willing to place her unborn child for adoption, that [the Caseys] were required to pay Jessica's expenses before her third-trimester, and [Defendants'] promises to obtain Jessica's medical records." In other words, the Caseys' evidence established that Defendants' communications in performance of the agreement contained the very misrepresentations that were at issue in the

30

Missouri action.[12] Defendants did not contradict these assertions, either. Thus, there was no dispute that Defendants' numerous communications with their Missouri clients contained the alleged misrepresentations, and caused the resulting harm, that was the gravamen of the Caseys' claims in Missouri.[13] As the Missouri court had found, "as a direct result of the deceptive, false, and misleading representations, [the Caseys] were induced to and did in fact purchase . . . services from the Defendants, in reliance upon Defendants' representations." These undisputed facts demonstrated

[12] Although Hill did not make all of these communications personally, Matthew averred that Boucher informed him that Hill was the source of the information communicated through Boucher, that Hill was "overseeing and directing all work done by the employees of Unique," and Boucher was merely "passing information back and forth between [Hill] and [the Caseys]." Matthew also provided copies of emails sent to him by Boucher stating that Boucher "forwarded [Matthew's] questions to [Hill]" and telling Matthew that "[Hill] recommends this adoption attorney to represent you in M[issouri]." Hill did not deny that she oversaw and directed Boucher's activities or that she was the source of the information Boucher transmitted to the Caseys.

[13] Although Defendants disputed whether they could be held liable for the alleged misrepresentations, it is sufficient for jurisdictional purposes that Defendants purposefully and voluntarily sent the communications that contained the allegedly fraudulent representations. As stated in *Yahoo! Inc. v. La Ligue Contre Le Racisme* (9th Cir. 2006) 433 F.3d 1199, 1207: "Many cases in which the *Calder* effects test is used will indeed involve wrongful conduct by the defendant. [Citations.] But we do not read *Calder* necessarily to require in purposeful direction cases that all (or even any) jurisdictionally relevant effects have been caused by wrongful acts. We do not see how we could do so, for if an allegedly wrongful act were the basis for jurisdiction, a holding on the merits that the act was not wrongful would deprive the court of jurisdiction." In other words, we need not determine whether Defendants committed intentional wrongdoing, but only whether the communications that formed the basis of the alleged fraud were themselves purposefully directed at Missouri, which we conclude they were.

resoundingly that, as in *Moncrief*, Defendants' communications were "purposely and voluntarily directed toward" Missouri, so that they " ' "should expect, by virtue of the benefit [they] receive[d], to be subject to the [Missouri] court's jurisdiction based on" [their] contacts with the forum.' " (*Moncrief, supra*, 238 Cal.App.4th at p. 1007.)

The trial court, in concluding otherwise, entirely ignored Defendants' case-related conduct, focusing instead on the fact that Defendants did not advertise in Missouri and "had no *other* business dealings or contacts with Missouri." (Italics added.) This was error. The specific jurisdiction inquiry must consider " ' "the relationship among the defendant, the forum, and the litigation." ' " (*Walden, supra*, 571 U.S. at pp. 283–284.) Indeed, when specific jurisdiction is based on an alleged tort, " 'the defendant's knowledge and intent in committing the tortious activity' " is "the very focus of the purposeful availment requirement." (*Pavlovich, supra*, 29 Cal.4th at p. 272.) Yet the trial court, in focusing on Defendants' non-litigation-related contacts with Missouri, excluded from its analysis any consideration of the communications that were at issue in the Missouri litigation. As we have discussed, Defendants' allegedly fraudulent representations about aspects of the desired adoption, all of which were directed at Missouri and quite predictably caused harm in Missouri when the falsehoods were discovered, were sufficient to establish purposeful availment. By ignoring Defendants' allegedly tortious conduct, which under controlling precedent satisfied the first prong of the constitutional inquiry, and looking elsewhere for minimum contacts, the trial court erred.

The trial court also relied on the fact that it was the Caseys who initiated the relationship by reaching out to Defendants. This, too, was error. "Whether a 'party solicited the business interface is irrelevant, so long as

defendant then directed its activities to the forum residents.' " (*Kennedy v. Freeman* (10th Cir. 1990) 919 F.2d 126, 129; *Lanier v. American Bd. of Endodontics* (6th Cir. 1988) 843 F.2d 901, 910; accord *Bryant*, *supra*, 310 S.W.3d at p. 235 ["the fact that someone else initiated the first contact does not mean that the entire course of conduct is considered unilateral"]; *West Corp.*, *supra*, 116 Cal.App.4th at p. 1176 [although residents initiated phone call to nonresident telemarketers, the telemarketers initiated allegedly unlawful upsell technique and thus "purposefully availed themselves of the privileges of conducting activities within the forum state"].) Although the Caseys may have sought out Defendants' services originally, it was Defendants who agreed to provide those services and then made a number of misrepresentations to the Caseys in the course of their ongoing relationship. This conduct was no less purposeful, and no less directed at Missouri, because the Caseys made the initial contact.

The trial court also relied on the parties' agreement. On appeal, as they did in the trial court, Defendants refer to section 11 of the agreement[14] as an arbitration clause, a choice-of-law provision, *and* a choice-of-forum provision. Section 11 of the agreement is, on its face, an arbitration clause; it

---

14    For ease of reference, we restate the relevant part of section 11 of the agreement here: "11. ARBITRATION. Any controversy. claim or dispute arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in the County of Riverside, State of California, before a sole arbitrator in accordance with the laws of the State of California for agreements made and to be performed in the State of California. [¶] The arbitration shall be administered by JAMS pursuant to its streamlined Arbitration Rules. The arbitration shall be conducted in the County of Riverside, State of California. Judgment on the award may be entered in any court having jurisdiction." (Boldface omitted.)

refers to itself as "this Agreement to arbitrate." However, accepting Defendants' characterization of section 11 of the agreement as containing "choice-of-law and choice-of-forum provisions," the trial court found these provisions "indicat[ed] that [D]efendants contemplated rendering their services in California, subject to California law, with any disputes to be adjudicated in California." Even so construed, that the parties' contract had a so-called choice-of-law provision is just a factor to be considered, it does not determine whether personal jurisdiction can constitutionally be exercised in another forum. (See *Burger King*, *supra*, 471 U.S. at p. 482.)

Moreover, parties to an agreement to arbitrate in California consent to the jurisdiction of California courts for the *limited* purpose of enforcing the arbitration agreement and any resulting award. (§ 1293.) However, "the right to arbitrate, like any other contract right, can be waived, either expressly or by implication." (*Thorup v. Dean Witter Reynolds, Inc.* (1986) 180 Cal.App.3d 228, 234 (*Thorup*); see *Menorah Ins. Co. v. INX Reinsurance Corp.* (1st Cir. 1995) 72 F.3d 218, 223 (*Menorah*) [defendant waived arbitration by allowing a default judgment to be entered and waiting until enforcement proceeding to seek arbitration].) Section 11 of the agreement does not select a judicial forum or indicate which state's courts will serve as the forum in the event the parties waive arbitration and submit their disputes to litigation. And as we later explain, Defendants have waived any contractual rights to a choice of forum, or to arbitration, by waiting until this proceeding to assert them.[15] (See Discussion, Section III., *post*.)

---

15    At oral argument, Defendants—citing *Airlines Reporting Corp. v. Renda* (2009) 177 Cal.App.4th 14, 20—repeatedly referred to the principle that a judgment debtor " ' "is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional

34

Further, while focusing on section 11 of the agreement as a basis to conclude that Defendants contemplated providing their services in California, the trial court simultaneously ignored other relevant aspects of the agreement as well as the parties' actual course of performance, which showed that Defendants not only contemplated but actually did provide a material part of their services by communicating with the Caseys in Missouri. (See *Burger King*, *supra*, 471 U.S. at p. 479 ["prior negotiations and contemplated future consequences, along with the terms of the contract *and the parties' actual course of dealing . . .* must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum" (italics added)].) The agreement expressly laid out that Unique's scope of services included "gathering information from prospective birthmothers and passing [it] on to Clients," and "act[ing] as an intermediary between parties to an adoption." To provide these services, Unique would obviously have to communicate with its clients, who were in Missouri. This is, of course, what actually did occur as the agreement was performed. This aspect of Unique's provision of services was material to jurisdiction because it was Defendants'

---

grounds in a collateral proceeding." ' " (*Ibid.*) They claimed this means it is not too late for them to invoke the agreement's arbitration clause. Defendants' argument conflates two concepts: fundamental jurisdiction, which is not subject to waiver; and the contractual right to arbitrate, which is subject to waiver. A party that chooses to ignore a judicial proceeding does so at her own risk, because if it turns out jurisdiction was proper, many of the challenges that could have been raised, including the option of arbitrating the dispute, will no longer be available. (See *Menorah*, *supra*, 72 F.3d at p. 223 ["The scenario here—in which a party knowingly opts out of the arbitration for which it has contracted . . . , sits on its hands while a default judgment is entered against it after service, refuses to pay, requires an enforcement action be filed against it, and only then cries 'arbitration'—undermines both the certainty and predictability which arbitration agreements are meant to foster."].)

client communications that ultimately formed the basis of the Caseys' lawsuit.

On appeal, in support of their contention the trial court erred in finding no purposeful availment, the Caseys cite a number of decisions (including *Bryant*, *supra*, 310 S.W.3d 227) that stand for the proposition that the purposeful availment requirement is met when, as here, nonresident defendants send fraudulent communications across state lines, injuring that state's residents. Tellingly, Defendants cite no authority that stands for the opposite proposition. Instead, they attempt to distinguish the decisions relied on by the Caseys. For example, they take the position that *Bryant* is distinguishable because it involved fraudulent documents rather than fraudulent oral representations. This is not a material distinction. (See, e.g., *Good World Deals, LLC v. Gallagher* (Mo.Ct.App. 2018) 554 S.W.3d 905, 913 [finding purposeful availment based on fraudulent communications transmitted verbally and in writing "through emails, text messages, and phone calls" because what mattered was "the fraudulent content of those communications" and not whether they were communicated in writing].)

Defendants also try to refute the conclusion that their allegedly false representations were actionable. They argue Hill stated in her declaration in support of the motion to vacate that Unique " 'did not and could not guarantee the outcome of a potential adoption attempt' " and that the agreement stated Unique made no representations about " 'the truthfulness of any information provided by birthmother.' " However, they do not contend the communications containing the alleged misrepresentations that formed the basis of the Caseys' claims did not occur, or that they were not actually harmful to the Caseys. The disclaimers could only serve to establish a possible basis for avoiding liability in the event of a dispute. Despite any

36

disclaimers, the fact remains that Defendants purposely directed allegedly tortious communications at Missouri that caused harm in Missouri, such that they could reasonably anticipate that any litigation arising from their conduct would be filed in Missouri.

In sum, the trial court, in finding Defendants did not purposefully avail themselves of the benefits of Missouri, failed to consider Defendants' case-specific conduct. Taking Defendants' numerous communications that contained the alleged misrepresentations into account leads to the conclusion they purposefully directed their tortious conduct at the Caseys in Missouri, such that the first prong of the specific jurisdiction test is easily met.

2. *Relatedness*

The second prong of the specific jurisdiction inquiry looks at whether the plaintiff's claims " 'arise out of *or relate* to the defendant's contacts with the forum.' " (*Ford Motor*, *supra,* 141 S.Ct. at p. 1026.) Here, the trial court specifically found that "the suit arose out of allegations that defendants committed a 'tortious act' in Missouri (i.e., fraud)." Defendants do not dispute this finding or deny that the relatedness element of the specific jurisdiction test was satisfied by the allegations in the Missouri action. We agree with their implicit concession that this requirement is met.

In *Ford*, the high court clarified that the nonresident defendant's forum contacts need not be causally related to the plaintiff's suit and that "some relationships will support jurisdiction without a causal showing." (*Ford Motor*, *supra,* 141 S.Ct. at p. 1026.) " ' " '[O]nly when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that [contact].' " ' " (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1068.) Here, Defendants' contacts with Missouri *were* causally related to the Caseys'

37

claims, which means they necessarily satisfied this prong of the jurisdictional test.

3.    *Fair Play and Substantial Justice*

The third prong of the specific jurisdiction test considers whether the exercise of jurisdiction "would offend ' "traditional notions of fair play and substantial justice." ' " (*Asahi Metal Indus. Co. v. Superior Court* (1987) 480 U.S. 102, 113.)  "Thus courts in 'appropriate [cases]' may evaluate 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.' " (*Burger King*, *supra*, 471 U.S. at pp. 476–477.)

However, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present *a compelling case* that the presence of some other considerations would render jurisdiction unreasonable." (*Burger King*, *supra*, 471 U.S. at p. 477, italics added.)  Because Unique and Hill had the requisite minimum contacts with California, it was their burden "to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.' " (*Vons*, *supra*, 14 Cal.4th at p. 476, quoting *Burger King*, at p. 477.)

The trial court, in determining the Missouri court's exercise of jurisdiction was unconstitutional, found it "fundamentally unfair that an individual and her small business, operating in one state, can enter into a written agreement to perform $15,500 worth of adoption-related services in that state, with a forum-selection clause saying any dispute will be brought

38

in that state, and then be sued in another state half-way across the country and become subject to a $500,000 default judgment in the other state without ever providing any services in that other state and without having any other contacts with the other state."

This analysis was flawed. To a large extent the trial court simply repeated the reasoning it used to find there had been no purposeful availment, which was erroneous for the reasons we have already discussed. The court also appeared to be influenced by its sense that the *result* of the Missouri litigation was unfair. However, the result of the out-of-state action is not among the factors courts are supposed to consider when undertaking this constitutional analysis. (See *Burger King, supra*, 471 U.S. at pp. 476–477.) The due process inquiry concerns the fairness of the exercise of personal jurisdiction in a particular case, not the fairness of the outcome of that case.

And while the trial court found it "fundamentally unfair" for "an individual and her small business, operating in one state, . . . [to] be sued in another state half-way across the country," this finding was made without any record support. Defendants presented no evidence of any burdens presented to them by being required to litigate in Missouri. Instead, their evidence focused on attempting to establish their lack of contacts with Missouri. Thus, the trial court appears to have simply assumed, by virtue of the distance involved, that it was unfair for a California individual and small business to be brought to court in Missouri. This assumption is out of step with the holdings of numerous courts that have found it fair to require individual defendants to litigate from distances comparable to the distance between California and Missouri. (See, e.g., *Burger King, supra*, 471 U.S. at p. 487 [not fundamentally unfair for a Michigan resident to be sued in

39

Florida]; *Yue v. Yang, supra*, 62 Cal.App.5th at p. 550 [Canadian resident could fairly be required to litigate in California]; *Integral Development. Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 592 [fair to require German resident to litigate in California].) The court's assumption was also at odds with the Supreme Court's position, one that has been stated and restated over the course of many decades, that "because 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." (*Burger King, supra*, 471 U.S. at p. 474.)

As we have just noted, Defendants did not present any evidence of burdens or inconveniences that the prospect of litigating in Missouri presented to them. The only developed argument they offered in the trial court on the topic of unfairness was that it would be "difficult and inconvenient for [them] to memorize and comply with the adoption facilitation laws of all 50 states." But as the Caseys pointed out, this was an irrelevant consideration because the Missouri action did not include any allegations that Hill or Unique violated Missouri adoption facilitation laws.

On appeal, Defendants contend it was unfair for the litigation to proceed in Missouri because "a critical witness—the birthmother, Jessica—was located in California" and "[i]t would have been unreasonable and cost-prohibitive" for her to "submit to a deposition in Missouri." However, they cite no record evidence supporting the conclusion that it would have been cost-prohibitive for Jessica to be deposed in Missouri. They also fail to explain why this problem could not be solved by taking her videotaped deposition in California. (See Mo. R. Civ. P. 57.03(c) ["Depositions may be

40

recorded by the use of videotape or similar methods"]; *Patton v. May Dep't Stores Co.* (Mo. 1988) 762 S.W.2d 38, 41 [" 'the rules of civil procedure do not prohibit the video taping of a deposition, nor do they prohibit the use of a video tape in trial to present the deposition testimony of the witnesses to the jury' "].)

Defendants also make a number of contentions based on the fact that Matthew is a licensed Missouri attorney.[16] They claim it "would have been far more convenient for a Missouri attorney to litigate in California" than for "a non-attorney California resident and her small business" to litigate in Missouri. We reject this argument because it is made without any record support. Defendants also contend Matthew was legally sophisticated and "should not have signed an agreement providing that California would be the forum for any dispute" if he wanted to file a lawsuit in Missouri. This is just another version of their argument about the effect of section 11 of the agreement, which we have already disposed of above. Finally, Defendants contend that because Matthew is a licensed Missouri attorney, he had a tactical advantage when litigating in Missouri. However, the fairness inquiry is focused on geographic burdens and inconveniences faced by defendants, not with evening out alleged home-state advantages unrelated to geography. Stated another way, the possibility of eliminating tactical advantages is not

---

[16]   In the trial court, Defendants presented a request for judicial notice of a document establishing Matthew's membership in the Missouri state bar. The Caseys did not object. Because the record contains no indication the request was denied, we presume that it was granted. (See Evid. Code, § 456 ["If the trial court denies a request to take judicial notice of any matter, the court shall at the earliest practicable time so advise the parties and indicate for the record that it has denied the request"]; *Aaronoff v. Martinez-Senftner* (2006) 136 Cal.App.4th 910, 918–919.)

one of the recognized factors that has been held to be relevant to the fairness analysis. (See *Burger King*, *supra*, 471 U.S. at p. 478.)

In sum, Defendants have not presented a compelling case that the Missouri court's exercise of personal jurisdiction was unfair or unreasonable. Because all three prongs of the test for specific jurisdiction are satisfied, it follows that the Missouri court's exercise of jurisdiction satisfied the requirements of due process.

## III.

*Defendants' Other Defenses to Recognition of the Missouri Judgment Lack Merit*

In the event we conclude the trial court erred in granting their motion on the ground that the Missouri court's exercise of personal jurisdiction violated Defendants' due process rights, Defendants ask us to affirm the court's order on the basis of the other affirmative defenses they raised in their motion. They ask us to consider the following three defenses: (1) their "choice-of-forum" defense based on section 11 of the agreement, (2) their "parole [sic] evidence" defense, and (3) their defense based on the Caseys' purported failure to inform the Missouri court of the parties' written agreement. Because they all lack merit, we are unable to affirm on the basis of any of these defenses.

The defenses that may be asserted in a motion to vacate under section 1710.40 are not well defined. The Act itself does not specify the available defenses. However, the Law Revision Commission's comment to section 1710.40 lists certain "[c]ommon" defenses. It states: "Common defenses to enforcement of a sister state judgment include the following: the judgment is not final and unconditional (where finality means that no further action by the court rendering the judgment is necessary to resolve the matter litigated);

42

the judgment was obtained by extrinsic fraud; the judgment was rendered in excess of jurisdiction; the judgment is not enforceable in the state of rendition; the plaintiff is guilty of misconduct; the judgment has already been paid; suit on the judgment is barred by the statute of limitations in the state where enforcement is sought." (Cal. Law Revision Com. com., 20 West's Ann. Code Civ. Proc. (2007 ed.) foll. § 1710.40, p. 385; see *Traci & Marx Co. v. Legal Options, Inc.* (2005) 126 Cal.App.4th 155, 158–159 (*Traci & Marx*).)

At the outset, we note that Defendants' defenses are *not* among those listed in the Law Revision Commission's comment to section 1710.40. Defendants contend they can raise them anyhow, because the list of defenses in the comment is not exclusive. They point to the fact that the comment states that the available defenses " ' "include" ' " those listed in the comment, suggesting the list is open-ended and other defenses may be available as well.[17] They further contend, although without any legal support, that the additional defenses that can be asserted include substantive defenses to the underlying claims.

---

[17]    One Court of Appeal has noted in dicta that "by using the word 'include,' the [Law Revision Commission] simply intended such defense references as examples of the types of defenses which fall within section 1710.40." (*Conseco, supra,* 221 Cal.App.4th at p. 839.) However, at least one other Court of Appeal has declined to decide whether the Law Revision Commission's list is illustrative rather than exhaustive. (*Liquidator, supra*, 54 Cal.App.4th at p. 976 ["While we do not express an opinion on whether the defenses listed by the Law Revision Commission are exclusive, we disagree with the proposition that section 473 presents a defense applicable to the entry of sister state judgments through section 1710.40."].) Here, we delineate the outer bounds of the defenses available under section 1710.40, by concluding that the unlisted defenses asserted by Defendants violate the mandate of the Full Faith and Credit Clause. "[T]he command of full faith and credit to judicial proceedings is subject to rare exceptions." (Rest.2d Conf. of Laws, § 103, com. a.)

43

Defendants misperceive the scope of defenses that a judgment debtor can raise to combat recognition or enforcement of a final sister state judgment. " ' "With respect to judgments, 'the full faith and credit obligation is exacting.' " ' " (*Blizzard Energy, Inc. v. Schaefers* (2020) 44 Cal.App.5th 295, 298 (*Blizzard Energy*), quoting *Hawkins v. SunTrust Bank* (2016) 246 Cal.App.4th 1387, 1393–1394.) " ' "A State may not disregard the judgment of a sister State because it disagrees with the reasoning underlying the judgment or deems it to be wrong on the merits." ' " (*Ibid.*)

Consistent with the full faith and credit that courts are constitutionally obligated to grant the judgment of the courts of sister states, and notwithstanding the seemingly open-ended nature of the list of defenses in the Law Revision Commission comment, section 1710.40 does not create an opportunity to raise defenses to the merits of the underlying claims resolved in the sister state judgment. " '[T]he law is well established that upon a claim that a foreign judgment is not entitled to full faith and credit, the permissible scope of inquiry is limited to a determination of whether the court of forum had fundamental jurisdiction in the case.' " (*Washoe, supra,* 47 Cal.App.4th at p. 1521.) "A California court, in ruling on a motion to vacate entry of a sister state judgment, may not retry the case." (*Blizzard Energy, supra*, 44 Cal.App.5th at p. 298, citing *Washoe, supra,* 47 Cal.App.4th at p. 1523.) To borrow the words of another court, "[t]his is not an appeal of the [Missouri] judgment." (*Traci & Marx, supra*, 126 Cal.App.4th at p. 161.)

Here, Defendants have never claimed the Missouri judgment is not final or unenforceable in Missouri. Nor have they claimed the Missouri court lacked subject matter jurisdiction over the underlying action. The Missouri court found Defendants were each properly served with notice of the action; Defendants have never disputed this finding. Pursuant to our discussion

44

above, the Missouri court's exercise of jurisdiction under its long-arm statute comported with the requirements of due process.

Accordingly, Defendants are now precluded from asserting defenses they could have, but did not, raise in the underlying action. "As long as the sister state court had jurisdiction over the subject matter and the parties, a sister state judgment is entitled to full faith and credit 'even as to matters of law or fact erroneously decided.' " (*Bank of America, supra*, 77 Cal.App.4th at p. 118.) Principles of res judicata apply to matters actually presented in the earlier proceeding as well as " 'any other available matter which might have been presented to that end.' " (*Chicot County Drainage Dist. v. Baxter State Bank* (1940) 308 U.S. 371, 378 (*Chicot*).)

Defendants' first defense to recognition violates these principles by attempting to invoke, for the first time, the so-called "choice-of-forum" provision in section 11 of the agreement. Defendants appear to contend that section 11 of the agreement raises a jurisdictional defect because it deprived the Missouri court of jurisdiction. Whether construed as a choice-of-forum clause or an arbitration clause, this contractual provision could not divest the Missouri court of its fundamental jurisdiction.[18] "[T]he parties may not deprive courts of their jurisdiction over causes by private agreement."

_____

[18] Determining the effect of section 11 of the agreement presents a choice of law question. "It is well established that while the courts generally enforce the substantive rights created by the laws of other jurisdictions, the procedural matters are governed by the law of the forum." (*World Wide Imports, Inc. v. Bartel* (1983) 145 Cal.App.3d 1006, 1012.) Here, the pertinent forum is Missouri. However, Defendants contend section 11 creates a substantive defense rather than a procedural defense, calling into question whether section 11 should be construed according to California law or Missouri law. We need not decide this issue, however, because as we explain, the result is the same under the laws of both states.

45

(*Smith, Valentino & Smith, Inc. v. Superior Court* (1976) 17 Cal.3d 491, 495 (*Smith*), citing Rest.2d Conflict of Laws, § 80, com. a.)

Further, in both California and Missouri, enforcement of arbitration provisions is not automatic. "[T]he right to arbitrate, like any other contract right, can be waived, either expressly or by implication." (*Thorup, supra,* 180 Cal.App.3d at p. 234; see *Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475; *Boulds v. Dick Dean Econ. Cars, Inc.* (Mo.Ct.App. 2010) 300 S.W.3d 614, 619 ["an arbitration agreement may be invalidated through state law contract defenses such as waiver or repudiation"].) The same goes for choice of forum provisions: even when they are invoked, enforcement is not automatic. (*Smith, supra,* 17 Cal.3d at p. 496 [California courts have discretion to decline to enforce choice of forum provisions]; *High Life Sales Co. v. Brown-Forman Corp.* (Mo. 1992) 823 S.W.2d 493, 497 & 496 fn.2 [holding that choice of forum clauses are enforceable, but Missouri courts may decline enforcement if they conclude enforcement would be unfair or unreasonable]; see *Andra v. Left Gate Prop. Holding, Inc.* (Mo. 2015) 453 S.W.3d 216, 231 ["a forum selection clause does not automatically determine a court's personal jurisdiction over a defendant"].)

Defendants fail to grapple with the unavoidable conclusion that they have waived any contractual rights to a choice of forum, or to arbitration, by waiting until this proceeding to assert them. (See *Menorah*, *supra*, 72 F.3d at p. 223 [defendant waived arbitration by allowing a default judgment to be entered and waiting until enforcement proceeding to seek arbitration].) They were properly served in the Missouri action and could have raised these issues in that proceeding. Instead, they chose not to appear, the Missouri court entered judgment, and that judgment is now final. Principles of res judicata apply to matters actually presented to defeat the claims asserted in

46

the earlier proceeding as well as " 'any other available matter which might have been presented to that end.' " (*Chicot, supra*, 308 U.S. at p. 378.) It is now too late for Defendants to attempt to invoke section 11 of the agreement.

Defendants' second defense—their "parole [sic] evidence defense"—suffers from the same problem. They offer it as a defense to what they describe as the Caseys' "promissory fraud allegations." In other words, they are trying to raise a defense to the underlying action as a defense to recognition of the Missouri judgment. They may not do so. "As long as the sister state court had jurisdiction over the subject matter and the parties, a sister state judgment is entitled to full faith and credit 'even as to matters of law or fact erroneously decided.' " (*Bank of America, supra*, 77 Cal.App.4th at p. 118.)

Even if it were not too late to assert this defense (and it is), it would make no difference, because it is a patently frivolous defense. The defense relies on a rule promulgated in *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258, 263, under which courts rejected "promissory fraud claims premised on prior or contemporaneous [oral] statements at variance with the terms of a written integrated agreement." (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 346 [discussing *Pendergrass*].) However, the *Pendergrass* rule no longer exists—it was abrogated almost a decade ago. (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1182 [overruling *Pendergrass* and calling it "an aberration"].)

The third defense that Defendants ask us to consider is based on their unsupported allegations that the Caseys committed wrongdoing in the Missouri action. They contend the Caseys "perpetrated a fraud on the Missouri court." Their citation to the record reveals they first raised this

47

defense in their supplemental brief in support of their motion to vacate, in a single paragraph at the end of their argument about their alleged choice of forum defense. Since the supplemental brief was filed more than 30 days after service of the notice of entry of judgment, it is questionable whether this defense was timely asserted. (§ 1710.40, subd. (b) [motion to vacate raising defenses must be file no later than 30 days after service of notice of entry of judgment].)

In any event, the defense lacks merit. Extrinsic fraud—which, according to the Law Revision Commission comment to section 1710.40, is the species of fraud that can be asserted as a defense to enforcement of a judgment—occurs when "the defrauded party was deprived of the opportunity to present his or her claim or defense to the court, that is, where he or she was kept in ignorance or in some other manner, other than from his or her own conduct, fraudulently prevented from fully participating in the proceeding." (*Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App.4th 17, 26–27.) Examples of extrinsic fraud include " 'concealment of the existence of a community property asset, failure to give notice of the action to the other party, and convincing the other party not to obtain counsel because the matter will not proceed (and then it does proceed).' " (*Navarro v. IHOP Properties, Inc.* (2005) 134 Cal.App.4th 834, 844.) This is not what occurred here. Defendants do not dispute that they received proper notice of the Missouri action. They do not contend that their lack of participation resulted from anything other than their own decision not to appear. Instead, they essentially claim that in their absence, the Caseys were obligated to raise issues they would have raised if they had elected to participate. This contention does not describe extrinsic fraud.

48

We further observe Defendants failed to substantiate their claim that the Caseys committed fraud on the Missouri court. Defendants' contention was based on Hill's averment that the Caseys "apparently did not inform the Missouri court that there was a written contract between the parties," because their operative pleading did not reference the agreement. However, the Caseys did not state a claim for breach of contract, making their failure to reference the agreement within their operative pleading immaterial. Defendants, who had the burden of proof, failed to present evidence that the Caseys did not alert the Missouri court to the existence of the agreement at any other stage of the proceedings.

We further observe a claim of extrinsic fraud is not available unless the defense the party was prevented from asserting is a meritorious one. (*New York Higher Education Assistance Corp. v. Siegel* (1979) 91 Cal.App.3d 684, 688.) Here, Defendants fall short of this requirement. In the trial court, the harm Defendants identified as resulting from the purported fraud was that the Missouri court never learned the parties' agreement contained a forum selection clause. This assumes a forum selection clause is self-executing, which, as we have discussed, it is not. On appeal, Defendants argue in a single sentence in their respondents' brief that the Caseys' supposed concealment of the agreement prevented the Missouri court from accurately determining whether Defendants did, in fact, represent "that certain acts would be performed and that a certain outcome would occur." This assertion fails because it is far too vague to describe cognizable harm from fraud, and because of the insufficient evidence there was any such fraud.

49

## DISPOSITION

The order is reversed and the matter is remanded to the trial court with instructions to enter a new order denying Defendant's motion to vacate entry of the Missouri judgment. The Caseys are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

DO, J.

WE CONCUR:

HALLER, Acting P. J.

O'ROURKE, J.

50